UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| DIANE OWEN, | ) | CIV. 08-5054 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTRODUCTION

This matter is before the court pursuant to a complaint filed by plaintiff Diane Owen on June 24, 2008, appealing the denial of her application for benefits by the Social Security Administration. <u>See</u> Docket 1. Defendant the Commissioner of the Social Security Administration opposes Ms. Owen's complaint and seeks an order of the court affirming the agency's decision. <u>See</u> Docket 11. The district court, the Honorable Karen E. Schreier, Chief Judge, referred this matter to this magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). <u>See</u> Docket 13.

## PROCEDURAL HISTORY

The agency filed the transcript of the proceedings below as an attachment to its answer at Docket 6. References to the administrative transcript are designated "A.R. ___." and can be located at Docket 6, attachments 1-3.

Diane Owen made application for disability insurance benefits on May 1, 2006, alleging an onset of disability of December 31, 2004, and seeking benefits under both Title II and Title XVI. A.R. 105-107. The agency denied the claim initially and upon reconsideration. A.R. 58-61, 64-67, 70-75. A hearing before an Administrative Law Judge (hereinafter "ALJ"), was requested and held on March 27, 2007. A.R. 29-57, 76-77. Both Ms. Owen and a vocational expert testified at that hearing. A.R. 29-57. At the hearing, Ms. Owen amended her alleged disability date to July 28, 2005. A.R. 39-40.

On May 21, 2007, the ALJ issued a written decision finding that Ms. Owen was not disabled and was capable of performing several sedentary positions. A.R. 16-28. Ms. Owen requested that the agency Appeals Council review the ALJ's decision. A.R. 13-15. Ms. Owen also supplemented the record with additional evidence from a psychologist, Dr. Dewey Ertz. A.R. 6-12. The Appeals Council considered this additional evidence, but denied Ms. Owen's request for review. A.R. 2-5. Ms. Owen thereafter timely filed this appeal.

**FACTS**

**A.     Medical Evidence in the Record**

On November 9, 2000, Ms. Owen underwent a L4-5 hemileminectomy and microdiskectomy.  A.R. 149.  Following this procedure, she was able to return to substantial gainful employment for a period of approximately five years.  A.R. 33-40.

Ms. Owen injured her low back on July 28, 2005, when she lifted a box of tile at her place of employment.  She was seen at the emergency room on August 1, 2005, complaining of severe low back and leg pain.  A.R. 239-241.  She was given a Toradol injection for pain relief.  Id.

Ms. Owen was then seen by Dr. Kari Lund, M.D., at Rapid City Community Health Center on August 16, 2005.  Dr. Lund noted that Ms. Owen reported radiation of pain down her right leg and that she had been put on light duty.  A.R. 251.  Dr. Lund prescribed the pain medication Percocet.  Id.

Dr. Lund saw Ms. Owen again on August 31, 2005, noting that Ms. Owen was still reporting pain in her right low back and down into her buttock and her right hip and straight down her right leg. A.R. 250.  Ms. Owen reported that Percocet reduced her pain from an "8" or "9" to a "6" or "7."  Id. The record reflects that Ms. Owen was taking Cymbalta for depression and anxiety and doing well on that medication.  Id.  Dr. Lund referred Ms. Owen to

Dr. Rice, a neurosurgeon, for further evaluation and refilled her prescription for Percocet.  Id.

Dr. Rice saw Ms. Owen on October 12, 2005, to evaluate her for potential surgery.  A.R. 265.  An MRI of Ms. Owen's spine showed a synovial syst on the left at L5, but no disk herniation or nerve root compression.  Id.  Dr. Rice did not believe that surgery was appropriate and referred Ms. Owen to Dr. Dietrich for an epidural steriod injection and conservative management.  A.R. 271.  Dr. Rice opined that Ms. Owen was capable of sedentary work with frequent positional changes.  A.R. 272.

On October 17, 2005, Dr. Dietrich administered a caudal epidural steroid injection to Ms. Owen.  A.R. 334.  He saw her again on November 3, 2005, at which time Ms. Owen complained of pain which she rated a "7" out of "10."  A.R. 330.  Dr. Dietrich recommended physical therapy and a trial of Lidoderm patches.  A.R. 332.

On November 11, 2005, Dr. Dietrich again administered bilateral L4-5 and L5-S1 lumbar facet injections.  A.R. 328.  When Dr. Dietrich saw Ms. Owen again on November 28, 2005, she reported that she did better for a while after the injections, but then her symptoms reappeared.  A.R. 325.  Ms. Owen had discontinued her Cymbalta and was tearful during this visit, which caused Dr. Dietrich to urge Ms. Owen to resume taking Cymbalta.  Id.  He also recommended resuming use of her pain medication and starting water

4

based physical therapy, since she had not tolerated land-based therapy well. Id.

When Dr. Dietrich next saw Ms. Owen on December 28, 2005, she reported doing better after resuming taking her Cymbalta and staring water based therapy. A.R. 323. Ms. Owen reported much improvement with her pain, rating it a "5" or "6" out of "10." Id.

On January 25, 2006, Ms. Owen again saw Dr. Dietrich and reported that her leg pain had nearly completely resolved and only low back pain remained. A.R. 322. Dr. Dietrich recommended that Ms. Owen continue with her physical therapy regime. Id. On February 22, 2006, Dr. Dietrich's notes indicate that Ms. Owen showed little progress since the last visit because Ms. Owen did not attend a significant number of physical therapy sessions, both due to poor attendance and illness. A.R. 321. Dr. Dietrich urged Ms. Owen to resume physical therapy on a schedule of two to three sessions per week for the next two to four weeks so that she could make some gains in strength and stability in her low back. Id.

On March 20, 2006, Ms. Owen was discharged from physical therapy because her worker's compensation insurance carrier discontinued her worker's compensation benefits. A.R. 378. Her physical therapy progress notes indicate that she attended a total of 17 or 18 sessions from December 2, 2005, until March 20, 2006. Id. Her compliance was stated to be "fair-to-poor"

due to Ms. Owen's frequent failures to appear or cancellations.  Id.  On February 27, 2006, it was noted that Ms. Owen had cancelled 9 appointments. A.R. 380.  On January 13, 2006, it was noted that she had cancelled 5 appointments.  A.R. 383.  It is unclear from the records whether Ms. Owen cancelled 14 total appointments (5 plus 9), or whether the total of 9 cancelled appointments includes the 5 previously documented in the earlier progress notes.  The physical therapist evaluated Ms. Owen's potential to be rehabilitated through physical therapy to be good.  A.R. 381.

Because she had no insurance benefits, Ms. Owen did not see Dr. Dietrich between February 22, 2006, and March 1, 2007.  However, she did visit the Rapid City Community Health Center on June 27, July 13, August 10, October 9, and November 22, all of 2006, and on January 17, 2007.  A.R. 343-346, 369-374.  Records from these visits show that Ms. Owen described chronic low back pain and ongoing depression, controlled by Cymbalta.  Id. Ms. Owen was also taking Motrin for her low back pain during this period of time; her prescription for Percocet having been discontinued in April of 2006. A.R. 343.  At some undocumented point, Ms. Owen was prescribed Vicodin for break-through back pain not addressed by the Motrin.  A.R. 369.

On November 21, 2006, Dr. Christopher T. Dietrich was deposed as part of Ms. Owen's ongoing worker's compensation claim.  See A.R. 347-368.  The same lawyer who represented Ms. Owen in this social security appeal also

represented her in her worker's compensation claim.  A.R. 347.  Dr. Dietrich's deposition was submitted to the agency in support of Ms. Owen's social security disability claim and is part of the administrative record from below.

Dr. Dietrich testified that he is a physical medicine rehabilitation physician.  A.R. 349.  Dr. Rice referred Ms. Owen to Dr. Dietrich after having determined that she was not a good candidate for surgery.  Id.  Furthermore, an MRI had been conducted on Ms. Owen prior to her first visit with Dr. Dietrich.  Id.  She had also been given an epidural injection that had given her 90 percent pain relief.  Id.  Dr. Dietrich's impressions of Ms. Owen's conditions were right lumbar radiculitis, lumbar degenerative disk disease, and lumbar facet related pain.  Id.  His prescribed treatment was physical therapy. Id.

Dr. Dietrich testified that Ms. Owen had significant muscle deconditioning in her abdomen and core.  A.R. 351.  Although he testified that the method Ms. Owen used to relieve her low back pain was to lie down, he did not testify that it was medically indicated for Ms. Owen to lie down.  A.R. 351-352.  In fact, when pressed, Dr. Dietrich testified that lying down was medically contraindicated because Ms. Owen's pain was caused in part by her deconditioning and lying down for several hours a day compounds her underlying deconditioning.  A.R. 355-356.

Dr. Dietrich testified that Ms. Owen suffered from constant severe and debilitating pain and that he did not think she was overstating her symptoms or malingering. A.R. 352. At the time of the deposition, Ms. Owen was not being treated by Dr. Dietrich because her worker's compensation benefits had been discontinued, but if he were treating her, Dr. Dietrich testified that a significant factor in Ms. Owen's pain were the deficits in her abdominal core area due to her deconditioning. A.R. 352. Therefore, his recommendation for treatment was physical therapy, strengthening, and stabilization along with repeat facet injections and possibly medial branch blocks. Id.

Dr. Dietrich's restrictions on Ms. Owen's work activities were that she should lift no more than 10 pounds, and perform no bending, squatting, kneeling, twisting, turning, climbing, pushing, pulling, work above her shoulders, or work below her knees. Id. He stated that she could stand for up to two hours, walk for up to two hours, and reach for up to two hours. Id. Dr. Deitrich summarized this as sedentary work. Id.

Ms. Owen saw Dr. Dietrich again on March 1, 7, and 26, 2007, presumably after her worker's compensation benefits were reinstated. A.R. 461, 469, 473. Dr. Dietrich again gave Ms. Owen lumbar facet injections, which gave Ms. Owen 20 to 25% relief in her low back pain, which she described pre-injection as a "4" to an "8" on a scale of "10." Id. Dr. Dietrich's

final records indicate that Ms. Owen was still taking Cymbalta and that that medication continued to work well in controlling her depression. A.R. 473.

On February 20, 2006, Dr. Wayne J. Anderson saw Ms. Owen for an independent medical exam at the request of her worker's compensation insurance carrier. A.R. 421-432. After reviewing Ms. Owen's medical records to date and examining her, Dr. Anderson opined that Ms. Owen could work in the light work category. A.R. 426.

On January 19, 2007, Dr. Anderson's deposition was taken, again in connection with litigation on Ms. Owen's worker's compensation claim. A.R. 433-435. Dr. Anderson testified that he is board certified in occupational medicine. A.R. 435. Dr. Anderson testified that Ms. Owen had a body mass index of 45. A.R. 439. He explained that a body mass index of 30 or more is considered obese, and a body mass index of 40 or more is considered morbidly obese. Id. Dr. Anderson testified that Ms. Owen's morbid obesity was a significant aggravating factor in her back pain. Id. Dr. Anderson was asked whether he thought it was reasonable for Ms. Owen to lie down to relieve her back pain and he responded, "Not really, no. She needs more exercise and less laying around." A.R. 440. Specifically, Dr. Anderson recommended swimming, walking, an elliptical machine, any form of exercise that was non-jolting and did not require any loading on one's back. Id. He also recommended strengthening exercises for Ms. Owen's back. Id. When Ms. Owen's lawyer

pointed out that she was no longer receiving worker's compensation benefits and could not attend physical therapy sessions, Dr. Anderson conceded that he could understand why she would want to lie down to relieve her pain. A.R. 440-441. However, Dr. Anderson never testified that lying down was medically necessary or recommended. In fact, his testimony was to the contrary. A.R. 440.

On May 25, 2006, approximately 10 months after her initial injury, Ms. Owen completed a report describing her daily functioning. A.R. 159-167. In that report, Ms. Owen indicated that she lives in a mobile home with her boyfriend. A.R. 159. She indicated that she cooks meals daily, takes care of her own personal hygiene, and does laundry, although sometimes her boyfriend transfers the clothes from the washer to the dryer for her. A.R. 159-161. She indicated that she cares for pets, feeding and watering them. A.R. 160. She stated that goes out for short walks, can drive herself in a car, and rides in a car, and can do all of these activities alone. A.R. 162. She shops for food up to three times per month. Id. She indicated that she pays the bills, handles a savings account, can count change, and uses a checkbook. Id. She indicated that she does not do yard work because it causes pain for a couple of days afterward when she does. A.R. 161-162.

Ms. Owen indicates that one of her hobbies is fishing, and that she can go fishing if she can sit down. A.R. 163. Ms. Owen enjoys sitting and talking

with visitors who come to her home.  Id.  She stated that she had no problems

getting along with family, friends, or neighbors.  A.R. 164.

As to her functional limitations, Ms. Owen reported that she can lift 10-

15 pounds, she can walk two blocks (one block out and back), that she can

follow written and spoken instructions.  Id.  She reported that her

illness/injury/condition affects her ability to lift, squat, bend, stand, reach,

walk, sit, kneel, climb stairs, complete tasks, and concentrate, although the

report does not attempt to quantify how much Ms. Owen believed these

activities were affected.  Id.

At the request of her worker's compensation insurance carrier, Ms. Owen

was seen for a psychological evaluation by psychologist Dewey Ertz, Ed. D., on

January 30, 2007, and again on March 16, 2007.  A.R. 6-12.[1]  Dr. Ertz

interviewed Ms. Owen, took her history, performed a mental status

examination, administered psychological testing including the Minnesota

Multiphasic Personality Inventory–II, the Wechsler Abbreviated Scale of

Intelligence, and the Wechsler Memory Scale–III.  Id.

Dr. Ertz summarized Ms. Owen's mental status history.  He stated that

Ms. Owen was first diagnosed as having bipolar disorder by Dr. Steven Manlove

in 2000.  A.R. 7.  At that time, she was also referred to Dr. Ertz for group

---

[1]Dr. Ertz's report was not received by the Social Security Agency until
after the ALJ had already issued his written decision.  For that reason, there is
no discussion of the evidence from Dr. Ertz in the ALJ's decision.

therapy due to her cannabis dependence.  Id.  She reported a past history of cannabis, alcohol, methamphetamine, and cocaine use.  A.R. 7, 9.   Although Dr. Ertz recorded that Ms. Owen has been taking prescribed psychoactive medications such as Paxil, Zyprexa and others since 1998, no other medical history pre-dating the year 2000 is recorded in Dr. Ertz's notes.  A.R. 7-8.

Dr. Ertz found Ms. Owen to be dressed and groomed appropriately and cooperative and verbal throughout the interview, noting that her thought processes were logical and coherent.  A.R. 9.  He noted that Ms. Owen is overweight.  Id.  Ms. Owen reported to Dr. Ertz that she had difficulties concentrating and focusing her attention on a daily basis and that she experienced feelings of worthlessness and depression.  A.R. 9.  Ms. Owen described adequate to lower levels of energy and stated that she did not experience periods of elevated activity.  Id.

The psychological testing administered to Ms. Owen indicated average results, falling at the 58th, 61st, and 61st percentiles.  A.R. 10.  These correspond to a verbal intelligence quotient ("I.Q."), of 103, a performance I.Q. of 104, and a full scale I.Q. of 104.  Id.  Her memory skills were found to range from a low of the 42nd percentile for auditory immediate memory to the high represented by her score in the 77th percentile for working memory.  Id.  Her personality profile showed that Ms. Owen is likely converting psychological problems into physical symptoms and that she would likely report a wide range

of somatic complaints not supported by her health problems. A.R. 10-11.
Dr. Ertz reported that Ms. Owen seems "preoccupied" with her physical
impairments. A.R. 11.

Dr. Ertz concluded that Ms. Owen's current diagnoses of bipolar disorder
and depression were accurate and appropriate, but he also indicated that she
currently presented with a diagnosis of undifferentiated somatization disorder,
not otherwise specified. A.R. 11-12. The treatment Dr. Ertz recommended for
Ms. Owen's mental status was to treat her chronic pain by engaging in pain
management services, individual therapy, anti-depressant and pain
medications. A.R. 12.

Dr. Ertz opined that Ms. Owen could return to work through engaging in
pain management services and outpatient mental health therapy, noting that
Ms. Owen possessed the "intellectual and memory skills necessary to function
adequately in an employment setting." A.R. 12. Dr. Ertz indicated that this
would likely be a slow process and Ms. Owen's return to full time employment
could not be predicted with 100% accuracy. A.R. 12. He suggested
consideration be given to sedentary employment which matches Ms. Owen's
physical limitations. Id.

Ms. Owen's employer denied her worker's compensation benefits from
February 2006 until sometime before the hearing before the ALJ which was

held on March 27, 2007.  A.R. 32.  At the time of the hearing before the ALJ,

Ms. Owen's worker's compensation benefits had been reinstated.  Id.

**B.    Testimony at the Hearing**

Ms. Owen testified at the hearing both in response to questions from the

ALJ and in response to questions from her own attorney.  She first described

her duties at various of her past jobs.  A.R. 33-38.  She then testified that on

July 28, 2005, while working at Menard's, she hurt her back lifting a box of

tile.  A.R. 38, 40.  She testified that she still has pain in her low back 24 hours

a day.  A.R. 40.  She described the pain as a sensation of pressure, feeling "like

somebody standing on" her low back.  Id.  She stated that her back will also

occasionally throb.  Id.  Ms. Owen stated that she takes one to three pills per

day of the prescription pain medication Vicodin for her low back pain and

occasionally uses Lidocaine or Lidoderm patches to augment the oral pain pills.

A.R. 41, 52.

Ms. Owen testified that her arms are strong enough to lift, but that she

has back pain after lifting 20 pounds. Id.  She responded that she did not know

if she could lift 10 pounds several times a day, but agreed that she could lift a

gallon of milk.[2]  A.R. 42.  She testified that she has trouble with any type of lifting that requires her to bend over or squat.  Id.

Ms. Owen testified that she walks down to the end of her street and back, a distance of about one block, and that it takes her about 20 minutes to complete such a walk.  A.R. 43.  However, when the ALJ commented that that seemed very slow to cover such a short distance, Ms. Owen explained that it takes her that long because she takes her two small dogs with her and lets them run around by a nearby creek.  Id.

Ms. Owen testified that she can stand "for awhile," and that most of the time sitting is "all right," but that sometimes sitting produces a throbbing sensation in her back.  A.R. 44.  Ms. Owen testified that she lays down every day for a two to three hour period.  A.R. 45.  She testified that it is "easier to find a comfortable position" when lying down.  Id.

Ms. Owen stated that she does physical therapy exercises on an exercise ball three times a week.  A.R. 46.  She testified that she had gained approximately 30 pounds since injuring her back on July 28, 2005, and that at

---

[2]The weight of a gallon of milk depends on the type of milk contained in the gallon jug, but is on average between 6.2 pounds and 8.5 pounds.  This fact was not contained in the administrative record, but is a fact capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  See Fed. R. Evid. 201(b).  Although the court could take judicial notice of this fact, it will not do so in this instance.  Instead, the information is provided to allow the court to judge the weight and consistency of Ms. Owen's testimony as against other evidence in the record.

the time of the hearing she weighed approximately 305 pounds.  <u>Id.</u>  She

testified that she is five feet nine and three-quarters of an inch in height.  <u>Id.</u>

Ms. Owen testified that she suffers from asthma, but that it is well-

controlled by the use of Advair.  A.R. 47.  She also testified that she suffers

from migraine headaches two to three times a week.  <u>Id.</u>  Usually, when she

gets a migraine, Ms. Owen testified that the headache goes away within a few

hours.  <u>Id.</u>  Occasionally, a headache will last for three days, whereupon

Ms. Owen has to see her physician for a shot.  <u>Id.</u>

Ms. Owen testified that she suffers from depression, but that she takes

Cymbalta for that condition.  A.R. 48.  Before beginning to take Cymbalta,

Ms. Owen testified that she would have crying spells where she could not quit

crying, but that since she started taking Cymbalta in August of 2005, she has

not had significant problems with crying spells.  A.R. 48-49.  She stated that

she sometimes has days when she is so depressed that she does not get out of

bed, but that that does not happen too often because her kids get her up.  A.R.

49.

Ms. Owen testified that she does not have any memory problems.

A.R. 50.  She testified that she gets along "pretty well" with people.  <u>Id.</u>  She

testified that she has three adult children, ages 20, 22, and 28, who all live

independently outside Ms. Owen's home.  <u>Id.</u>  Ms. Owen stated that she lives in

a trailer house with her boyfriend.  <u>Id.</u>  Ms. Owen testified that she does the

cooking, washes dishes, and folds laundry, while her boyfriend cleans the floors and washes and dries the laundry.  A.R. 50-51.

Bill Tisdale, a vocational expert, also testified at the hearing.  Mr. Tisdale testified in response to a hypothetical question that a person who could lift and carry no more than 10 pounds, could occasionally stand, walk and reach, could not perform any of Ms. Owen's past relevant work.  A.R. 54.  Mr. Tisdale testified that a person with Ms. Owen's age, education and work experience, as well as the aforementioned functional limitations, *could* do other unskilled work available in substantial numbers in the national economy.  A.R. 55. Specifically, Mr. Tisdale identified the occupations of callout operator, surveillance system monitor, and information clerk, all of which were sedentary, unskilled jobs.  Id.  Mr. Tisdale testified that Ms. Owen had transferrable skills from her previous jobs that would enable her to perform these three jobs.  Id.

Mr. Tisdale testified that if the hypothetical were changed such that the person had a need to lie down two to three hours a day, there would not be any work that person could perform that existed in substantial numbers in the national economy.  A.R. 56.  All of Mr. Tisdale's testimony was elicited by questioning from the ALJ; Ms. Owen's attorney declined to pose any questions of his own to Mr. Tisdale.  Id.

**C.      Decision of the ALJ**

The ALJ issued his decision on May 21, 2007.  A.R. 16.  Applying the

five-step sequential analysis, the ALJ found that Ms. Owen was not entitled to

disability benefits.  The ALJ applied the following five step sequential analysis,

which is the same for both Title II and Title XVI benefits.  First, step one

requires the ALJ to determine whether the claimant is engaging in substantial

gainful employment.  If not, then step two requires the ALJ to determine

whether the claimant suffers from a medically determinable impairment that is

severe, or a combination of impairments that is severe.  A medically

determinable impairment can only be established by an acceptable medical

source.  An impairment or combination of impairments is severe if it

significantly limits an individual's ability to perform basic work activities.  An

impairment or combination of impairments is not severe when medical and

other evidence establish only a slight abnormality or a combination of

abnormalities that would have no more than a minimal effect on an individual's

ability to work.  If the claimant suffers from a severe impairment or

combination of impairments, the ALJ is required to determine at step three if

the claimant's impairment or combination of impairments meets or exceeds the

criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1

(20 C.F.R. §§ 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  If the

claimant's condition meets or exceeds a listed condition, then she is disabled.

If not, step four requires the ALJ to determine whether a claimant's residual functional capacity allows her to return to any of her past relevant work. If not, step five requires the ALJ to determine whether the claimant can do any other work that exists in substantial numbers in the national economy given the claimant's residual functional capacity, age, education, and work experience.

The ALJ determined at step one that Ms. Owen had not been engaged in substantial gainful activity. A.R. at 22. At step two, the ALJ determined that Ms. Owen suffered from the following impairments, which were severe: obesity, lumbar degenerative disc disease, status post-L4-5 microdiscectomy, lumbar facet degenerative joint disease, migraine headaches, and asthma. Id. The ALJ recognized that Ms. Owen had alleged that she was impaired by the mental conditions of bipolar disorder and depression. A.R. 23. The ALJ found that these impairments were medically determinable, but not severe because these conditions were well controlled by medication. A.R. 23-24.

At step three, the ALJ found that neither Ms. Owen's impairments nor any combination of impairments met or exceeded a listed impairment. A.R. 24. Accordingly, the ALJ determined at step four that Ms. Owen's residual functional capacity (hereinafter "RFC") did not allow her to return to any of her past relevant work. A.R. at 24-27. In so deciding, the ALJ determined that Ms. Owen's RFC allowed her to perform all work activity, with the limitations

that she could not lift or carry more than 10 pounds, and she could only occasionally stand, walk, and reach.  A.R. 24.

In arriving at this assessment of Ms. Owen's RFC, the ALJ reviewed the medical evidence in the record, the testimony at the hearing, and the daily activity questionnaire submitted by Ms. Owen.  A.R. 24-26.  The ALJ ascribed great weight to the opinions of Ms. Owen's treating physician, Dr. Dietrich, and to the opinion of examining physician, Dr. Rice, both of whom opined that Ms. Owen could perform sedentary work.  A.R. 26.  The ALJ found that these opinions of these two physicians were supported by objective medical evidence in the record.  Id.  The physicians' specialties were in physical rehabilitation and neurology, respectively.  Id.  Furthermore, the ALJ found that the opinions of these two physicians were consistent with the overall medical evidence in the record, including the claimant's own testimony.  Id.

The opinions of examining physicians Dr. Anderson and the two State agency physicians who opined that Ms. Owen was capable of light exertional restrictions was given less weight by the ALJ because the opinions were not consistent with the overall record.  Id.

The ALJ credited Ms. Owen's testimony concerning her RFC.  Id.  He noted that Ms. Owen's complaints were consistent with treating and examining medical sources.  Id.  The ALJ specifically addressed Ms. Owen's testimony that she lies down during the day to help relieve her pain.  A.R. 27.  The ALJ

noted that even Ms. Owen did not testify that lying down was necessary to her functioning, only that she was made more comfortable by lying down. Id. The ALJ also noted that no medical source documented a medical need for Ms. Owen to lie down. Id. Dr. Deitrich, who agreed that it might help Ms. Owen relieve her pain to lie down, nevertheless opined that Ms. Owen could do sedentary work. Id. The ALJ relied on Ms. Owen's testimony that she could perform most normal activities of daily living, including cooking, washing dishes, shopping, taking care of her dogs, paying bills, and social visiting, albeit at a sedentary level. Id. The ALJ concluded that Ms. Owen's testimony was consistent with the medical opinions of record and held that Ms. Owen could perform work at a sedentary level on a regular and continuing basis. Id.

The ALJ found that Ms. Owen was 44 years old at the time and that she had a high school education. A.R. 27. Based on her age, education, past work experience, and RFC, the ALJ concluded that there were jobs existing in substantial numbers in the national economy that Ms. Owen could perform. A.R. 27. Specifically, relying on the vocational expert's testimony, the ALJ identified the following sedentary, unskilled jobs that Ms. Owen could do: call out operator, surveillance system monitor, and information clerk. A.R. 28. The ALJ specifically found, again relying on the vocation expert's testimony, that Ms. Owen had transferable skills from her past work such as the skill of giving information to the public, verbal recording, and record keeping. Id. Based on

the conclusion that Ms. Owen was capable of performing other work, the ALJ

determined that she was not entitled to disability benefits.  Id.

## DISCUSSION

**A.    Standard of Review**

The decision of the ALJ must be upheld if it is supported by substantial

evidence in the record as a whole.  See 42 U.S.C. § 405(g); Choate v.

Barnhart,457 F.3d 865, 869 (8th Cir. 2006).  Substantial evidence is less than a

preponderance, but enough evidence that a reasonable mind might find it

adequate to support the conclusion.  See Baker v. Barnhart, 457 F.3d 882, 892

(8th Cir. 2006); see also McKinney  v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000);

Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L.Ed. 2d

842 (1971).  Review by this court extends beyond a limited search for the

existence of evidence supporting the Commissioner's decision to include giving

consideration to evidence in the record which fairly detracts from the decision.

See Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006); Craig v. Apfel, 212

F.3d 433, 435 (8th Cir. 2000).

The court's role under § 405(g) is to determine whether there is

substantial evidence in the record as a whole to support the decision of the

Commissioner and not to re-weigh the evidence.  See Vester v. Barnhart, 416

F.3d 886, 889 (8th Cir. 2005); Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir.

2005).  Furthermore, a reviewing court may not reverse the Commissioner's

decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)); see also Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004). The court must review the Commissioner's decision to determine if an error of law has been committed. See Olson ex rel. Estate of Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act. See Smith, 982 F.2d at 311; see also Olson ex rel. Estate of Olson, 170 F.3d at 824. If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. See Baker, 457F.3d at 892.

The same five-step analysis determines eligibility for Title II benefits as well as for Title XVI benefits. See House v. Astrue, 500 F.3d 741, 742 n.1 (8th Cir. 2007). The five-step sequential evaluation process as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age,

education, and work experience);(4) whether the claimant has the residual

functional capacity to perform his or her past relevant work; and (5) if the

claimant cannot perform the past work, the burden shifts to the Commissioner

to prove that there are other jobs in the national economy that the claimant

can perform.  Baker  v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

**B.      Whether the ALJ Erred in Concluding that Ms. Owen's Mental
          Condition Was Not a Severe Impairment**

Ms. Owen argues that her depression constituted a severe impairment

when considering the evidence from Dr. Dewey Ertz as part of the record as a

whole.  The ALJ did not have Dr. Ertz's evidence before him when he issued his

written opinion, but the Appeals Council had that evidence when it declined to

review the ALJ's decision.  Under these facts, Dr. Ertz's report is to be

considered part of the administrative record on appeal.  Davidson v. Astrue,

501 F.3d 987, 990 (8th Cir. 2007).  Thus, the court must determine whether the

ALJ's conclusion that Ms. Owen's mental condition was not a severe

impairment is supported by substantial evidence in the record as a whole,

including Dr. Ertz's report.  Id.

If an impairment is adequately controlled by treatment or medication, it

is not a disabling condition.  Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir.

2004).  The record is replete with documentation of the fact that Ms. Owen's

depression was being controlled by her prescription medication, Cymbalta.

Therefore, the conclusion that Ms. Owen's depression was not a severe or

disabling condition was supported by substantial evidence in the record as a

whole.  Id.

Furthermore, even if Ms. Owen's depression was considered a severe

impairment at step two, Dr. Ertz's report is highly relevant to the analysis

required at step five of the sequential analysis:  given Ms. Owen's RFC, is there

other work existing in substantial numbers in the national economy that

Ms. Owen could do?  Dr. Ertz answered this question unequivocally: "yes."  He

stated in his report that Ms. Owen could successfully return to work through

pain management services and outpatient mental-health therapy, and

specifically recommended that consideration should be given to sedentary

employment that matches Ms. Owen's physical limitations.  A.R. 12.  That is

exactly what the ALJ, relying on the vocational expert's testimony, concluded.

Far from contradicting the ALJ's conclusions, this court finds that Dr. Ertz's

conclusions are congruent with the ALJ's decision and, thus, does not provide

a basis for reversal.[3]

_____

[3]The court notes that somatoform disorder may, in an appropriate case,
form the basis of a decision awarding a claimant disability benefits.  See e.g.
Lauer v. Barnhart, 321 F.3d 762, 763 (8th Cir. 2003) (noting that ALJ awarded
disability benefits based on claimant's diagnosis of somatoform disorder in
combination with other impairments).  However, in this case, Ms. Owen did not
urge somatoform disorder as a mental impairment either in proceedings before
the agency or before this court.  Therefore, the court does not address in this
opinion whether Dr. Ertz's diagnosis would support an award of disability
benefits to Ms. Owen.  Regardless of the diagnosis, Dr. Ertz opined that there
was sedentary work that Ms. Owen was capable of doing.  A.R. 12.

The case of <u>Jenkins v. Apfel</u>, 196 F.3d 922 (8th Cir. 1999), cited by Ms. Owen as authority in support of reversal, is not to the contrary. In that case, the Eighth Circuit reversed because evidence from Jenkins' treating physician that was submitted after the ALJ had rendered his decision showed that Jenkins had less RFC than the ALJ had found. <u>Id.</u> at 923-924.

Here, unlike in <u>Jenkins</u>, the evidence submitted after the ALJ rendered his decision was from an examining physician, not a treating physician. This is significant for reasons discussed in the section below. Furthermore, the new evidence in <u>Jenkins</u> *contradicted* the ALJ's assessment of Jenkins' RFC, while in this case, Dr. Ertz's opinion *agrees* with the ALJ's conclusion that Ms. Owen can perform sedentary work, despite her impairments. The court recommends denying this ground as a basis for reversal of the agency's decision.

**C.    Whether the ALJ Erred in Rejecting the Opinions of Dr. Dietrich and Dr. Anderson as to Ms. Owen's Need to Lie Down**

Ms. Owen argues in this appeal that Dr. Dietrich and Dr. Anderson both provided medical opinions that supported the conclusion that Ms. Owen was required to lie down two to three hours a day and that this limitation should have been included in the hypothetical question to the vocation expert in determining Ms. Owen's RFC.

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." <u>Lacroix v.</u>

26

Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoting Strongson v. Barnhart,

361 F.3d 1066, 1070 (8th Cir. 2004)); see also  Cox v. Astrue, 495 F.3d 614,

619 (8th Cir. 2007) (because RFC is a medical question, the ALJ's decision must

be supported by some medical evidence of the claimant's ability to function in

the workplace, but the ALJ can consider nonmedical evidence as well).

Medical opinions are considered evidence which the ALJ will consider in

determining whether a claimant is disabled, the extent of the disability, and the

claimant's RFC.  See 20 C.F.R. § 416.927(a)(2).  All medical opinions are

evaluated according to the same criteria, namely:

–whether the opinion is consistent with other evidence in the
    record;

--whether the opinion is internally consistent;

–whether the person giving the medical opinion examined
    the claimant;

–whether the person giving the medical opinion treated the
    claimant;

–the length of the treating relationship;

–the frequency of examinations performed;

–whether the opinion is supported by relevant evidence,
    especially medical signs and laboratory findings;

–the degree to which a nonexamining or nontreating
    physician provides supporting explanations for their
    opinions and the degree to which these opinions
    consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about
medical issues related to his or her area of specialty;
and

–whether any other factors exist to support or contradict the
opinion.

See 20 C.F.R. § 416.927(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir.

2007).

"A treating physician's opinion is given controlling weight 'if it is well-

supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence.' "

House, 500 F.3d at 744 (quoting Reed, 399 F.3d at 920); 20 C.F.R. §

416.927(d)(2). "A treating physician's opinion 'do[es] not automatically control,

since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920

(quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the

treating relationship and the frequency of examinations of the claimant are also

factors to consider when determining the weight to give a treating physician's

opinion. 20 C.F.R. § 416.927(d)(2)(i). "[I]f 'the treating physician evidence is

itself inconsistent,' " this is one factor that can support an ALJ's decision to

discount or even disregard a treating physician's opinion. House, 500 F.3d at

744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854;

Guilliams, 393 F.3d at 803). "The opinion of an acceptable medical source who

has examined a claimant is entitled to more weight than the opinion of a

source who has not examined a claimant." Lacroix, 465 F.3d at 888 (citing 20

C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)); <u>Shontos v. Barnhart</u>, 328 F.3d 418, 425 (8th Cir. 2003); <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict.  <u>Wagner</u>, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion.  <u>Wagner</u>, 499 F.3d at 849; <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing <u>Jenkins</u>, 196 F.3d at 925).  However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's RFC determination, such a conclusion may be supported by substantial evidence.  <u>Harvey</u>, 368 F.3d at 1016.

Certain ultimate issues are reserved for the Agency's determination. 20 C.F.R. § 416.927(e).  Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination."  <u>House</u>, 500 F.3d at 745 (citing <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th Cir. 2002)).  <u>See</u> 20 C.F.R. § 416.927(e)(3).  The ultimate issues reserved to the Agency are as follows:

1.    whether the claimant is disabled;

2.    whether the claimant is able to be gainfully employed;

3.     whether the claimant meets or exceeds any impairment in the Listing of Impairments (appendix 1 to subpart P of part 404 of 20 C.F.R.);

4.     what the claimant's RFC is; and

5.     what the application of vocational factors should be.

See 20 C.F.R. § 416.927(e)(1) and (2); see also Wagner, 499 F.3d at 849 (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment.") (quoting Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)).  The RFC determination is specifically noted to be one of those determinations that are an ultimate issue for the Agency to determine.  20 C.F.R. § 416.927(e)(2); Cox, 495 F.3d at 619-620.

Here, there is simply no support for Ms. Owen's assertion that the ALJ disregarded the testimony of Dr. Dietrich and Dr. Anderson.  Neither doctor gave an opinion that it was medically necessary or medically desirable for Ms. Owen to lie down in order to contend with her low back pain.  In fact, both doctors stated that a significant factor in Ms. Owen's back pain was her deconditioned status, and that lying down was actually contraindicated because it contributed further to her deconditioned status.  A.R. 355-356, 439-440.  What both doctors did testify to was that it was understandable to them why Ms. Owen did lie down as often as she did:  it provided a certain amount of relief, particularly at a time when physical therapy was not available to her

because her worker's compensation benefits had been terminated.[4]  A.R. 351-352, 440-441.  However, both doctors remained steadfast in their opinions that Ms. Owen was capable of working, Dr. Dietrich opining that she could work at a sedentary level and Dr. Anderson opining that she could work at a light exertional level.  A.R. 352, 426.

The ALJ's decision fully credits Dr. Dietrich's opinion, and thus, accords "substantial weight" to his opinion in accordance with legal standards.  House, 500 F.3d at 744 (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 416.927(d)(2).  The ALJ's decision is fully congruent with Dr. Dietrich's opinion:  both agree that Ms. Owen is capable of sedentary work.  Contrary to Ms. Owen's characterization of Dr. Dietrich's testimony, Dr. Dietrich never recommended that she lie down to relieve her pain or that it was necessary or desirable for her to do so.  A.R. 351-356.  Therefore, the ALJ committed no error in evaluating Dr. Dietrich's opinion.

Dr. Anderson was not a treating physician, but rather a physician who conducted a review of Ms. Owen's records and conducted a one-time examination of her.  The ALJ rejected Dr. Anderson's opinion that Ms. Owen could work at the higher exertional level of "light work," instead adopting

---

[4]Of course, Ms. Owen's worker's compensation benefits were reinstated shortly before the hearing before the ALJ.  Nevertheless, the record before this court is silent as to whether she resumed physical therapy thereafter and, if so, whether her condition improved.

Dr. Dietrich's opinion that Ms. Owen was capable of sedentary work only. However, this disregard of Dr. Anderson's opinion is not what Ms. Owen takes issue with in this appeal. Instead, as with Dr. Dietrich, Ms. Owen argues that Dr. Anderson's opinion was that Ms. Owen should lie down two to three times a day to relieve her pain. Again, as with Dr. Dietrich, that is not Dr. Anderson's testimony. In fact, Dr. Anderson was very emphatic in saying that what Ms. Owen needed was *less* lying down and more non-impact physical therapy and exercise. A.R. 440. Thus, the ALJ's conclusion, far from disregarding Dr. Anderson's opinion, is congruent with Dr. Anderson's opinion.

## D. Whether the ALJ Erred in Discrediting Ms. Owen's Assessment of Her RFC

Ms. Owen argues in her brief that the ALJ erred in discrediting Ms. Owen's testimony. However, the opinion of the ALJ indicates that the ALJ credited Ms. Owen's testimony as to her RFC. The crux of the issue with regard to Ms. Owen's testimony was her testimony about lying down two to three hours a day. The ALJ characterized Ms. Owen's testimony to be that her RFC did not require her to lie down, but that she did so because it made her more comfortable. Thus, the real issue is whether the ALJ's characterization of Ms. Owen's testimony about lying down is a fair characterization. Ms. Owen's actual testimony on this point is as follows:

Ms. Owen: I go lay down and then . . .

ALJ: Do you lay down every day?

32

Ms. Owen:  Yeah.

ALJ:  For how long?

Ms. Owen:  Probably two to three hours.

ALJ:  Oh, at a time?

Ms. Owen:  Yeah.

ALJ:  Is there a particular time during the day that you do this?

Ms. Owen:  It's usually after I've been up.  I get up and, you know, let the dogs out.  I try to fix myself something to eat and sit down, watch a little TV for a little while and then I'll go lay down and watch a little TV back there. You know, when [the pain] starts, then I'll take my pain medication and lay there for awhile.

ALJ:  So is laying down more comfortable for you?

Ms. Owen:  It's easier–yeah.  It is more comfortable.  It's . . .

ALJ:  Do you . . .

Ms. Owen:  . . . easier to find . . .it . . .

ALJ:  . . . lay on your back . . .

Ms. Owen:  It . . .

ALJ:  your side or what?

Ms. Owen:  On my side.  It's easier to find a comfortable position.

ALJ:  Okay.

Ms. Owen:  I use a lot of pillows.  So . . .

ALJ:  A lot of what?

Ms. Owen:  A lot of pillows.

ALJ:   In what way do you use the pillows?

Ms. Owen:   Well, you put them under your legs, you know, and
just to . . . I don't know how to explain it.  It's kind of...

See A.R. at 45-46.

Ms. Owen never testified that her condition compelled her to lie down two to three hours a day.  A.R. 45-46.  Instead, as the ALJ stated, she merely testified that it was more comfortable for her to lie down.  The ALJ credited Ms. Owen's testimony.  Ms. Owen's testimony did not go so far as to establish that her disabling conditions *required* her to lie down.  Id.  The court notes that this is not a case where a *pro se* claimant may have inartfully stated her claim and an ALJ took advantage of the situation by failing to fully develop the record.  Instead, Ms. Owen was represented by counsel at the hearing before the ALJ when she gave this testimony and has been represented continuously up to the present.  Counsel did nothing to dispel or further bolster Ms. Owen's testimony on this point when his turn for questioning Ms. Owen was presented.  A.R. 51-52.

Assuming, for the sake of argument, that Ms. Owen's testimony could be interpreted as evidence that her disabling conditions compel her to lie down two to three hours a day, and that the ALJ discounted that testimony in arriving at Ms. Owen's RFC, the court nevertheless finds that the ALJ's decision should be affirmed.

In determining whether to fully credit a claimant's subjective complaints of disabling pain, an ALJ must consider several factors, including: whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional pain medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Wagner, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). A claimant's subjective complaints of pain may be discredited only if they are inconsistent with the evidence as a whole. Id.

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities." Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original). Although activities which are inconsistent with a claimant's testimony of disabling pain reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not

support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

In the Wagner case, the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where Wagner had engaged in extensive daily activities, as evidenced by his "Daily Activities Questionnaire" and his testimony at the hearing, and where his testimony as to the limiting effect of his pain was inconsistent with the medical record because his records reflected that he did not pursue ongoing evaluation or treatment for his pain and he did not seek or take pain medication on a regular basis. Wagner, 499 F.3d at 852-853. See also Baker, 457 F.3d at 892-894 (affirming ALJ's discrediting of claimant's subjective complaints of pain where claimant engaged in a significant amount of activities of daily living–full self-care, driving a car, shopping, and running errands–a medical source opined that the claimant engaged in symptom exaggeration, the claimant did not take pain medication, and the absence of an etiology for the alleged pain).

In Patrick v. Barnhart, 323 F.3d 592 (8th Cir. 2003), the claimant alleged Graves disease as a disabling condition and testified at the hearing before the ALJ that she mostly reclined all day with her feet up and watched television and talked to her neighbors. Id. at 594-595. The ALJ discounted Patrick's

allegation that she needed to recline and keep her feet up all day because there was no objective medical record that supported the allegation.  Id. at 595. Instead, Patrick's treating physician opined that Patrick might need to lie down for 30 minutes in an 8-hour work day and that it would be helpful to prop her legs up one to three times per day.  Id.  Patrick's physician opined that Patrick could engage in sedentary work, and the ALJ adopted this conclusion in his written opinion denying benefits.  Id.  Because the ALJ's findings were consistent with the limitations articulated by Patrick's own treating physicians, the Eighth Circuit affirmed the ALJ's discounting of Patrick's testimony as to her need to recline most of the day.  Id. at 595-596.

In Blakeman v. Astrue, 509 F.3d 878 (8th Cir. 2007), the claimant, who suffered a congenital heart condition, had testified at the hearing before the ALJ that he napped one to two hours each afternoon.  Id. at 882.  In determining Blakeman's RFC, the ALJ discounted this testimony concerning naps.  Id. at 882-883.  The Eighth Circuit affirmed because the medical evidence in the record, including Blakeman's treating physician, did not support a limitation on Blakeman's functioning as testified to by Blakeman. Id.  The Eighth Circuit stated that the issue was not whether Blakeman in fact did nap every day, a fact not contested, but rather, whether Blakeman's disability compelled him to nap each afternoon.  Id.

Here, Ms. Owen indicated that she cooks meals daily, takes care of her own personal hygiene, and does laundry, although sometimes her boyfriend transfers the clothes from the washer to the dryer for her. A.R. 159-161. She indicated that she cares for pets, feeding and watering them. A.R. 160. She stated that goes out for short walks, can drive herself in a car, and rides in a car, and can do all of these activities alone. A.R. 162. She shops for food up to three times per month. Id. She indicated that she pays the bills, handles a savings account, can count change, and uses a checkbook. Id. She indicated that she does not do yard work because it causes pain for a couple of days afterward when she does. A.R. 161-162.

Ms. Owen indicates that one of her hobbies is fishing, and that she can go fishing if she can sit down. A.R. 163. Ms. Owen enjoys sitting and talking with visitors who come to her home. Id. She stated that she had no problems getting along with family, friends, or neighbors. A.R. 164.

As to her functional limitations, Ms. Owen reported that she can lift 10-15 pounds, she can walk two blocks (one block out and back), that she can follow written and spoken instructions. Id. She reported that her illness/injury/condition affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and concentrate, although the report does not attempt to quantify how much Ms. Owen believed these activities were affected. Id.

38

Sedentary work is defined by the agency as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  Haley v. Massanari, 258 F.3d 742, 749 n.7 (8th Cir. 2001) (quoting 20 C.F.R. § 404.1567(a)).

Ms. Owen's own testimony as to her daily activities certainly fits this definition of sedentary.  Furthermore, to the extent that Ms. Owen's testimony at the hearing before the ALJ can be construed to support the contention that her disability compels her to lie down for two to three hours a day and the ALJ discredited this testimony, the ALJ was justified in discrediting this testimony. Blakeman, 509 F.3d at 882-883; Patrick  No where in the medical record is there support for this alleged limitation.  Dr. Dietrich, Ms. Owen's treating physician, and Dr. Rice, an examining physician, and Dr. Ertz, an examining psychologist, all opined that Ms. Owen was capable of sedentary work. A.R. 12, 265, 271, 352.  Dr. Dietrich and Dr. Anderson, another examining physician, specifically testified that lying down was contraindicated for Ms. Owen's back pain because a significant factor in her back pain was deconditioning, and lying down compounded the problem Ms. Owen suffered

from deconditioning.  A.R. 355-356, 440.  Furthermore, the record indicates that Ms. Owen benefitted significantly from physical therapy, was evaluated to have a good chance at rehabilitation through physical therapy,  but had a poor record of attendance, cancelling either 9 or 14 sessions within a three and one-half month period.  A.R. 380-383.  Noncompliance with medical recommendations is one of the grounds that is relevant to assessment of a claimant's credibility.  <u>Wagner</u>, 499 F.3d at 851; <u>Polaski</u>, 739 F.2d at 1322. Here, the fact that Ms. Owen cancelled so many appointments within such a short period of time is all the more significant for the fact that these cancellations took place during a time when her worker's compensation insurance carrier was paying for the physical therapy.  <u>Id.</u>  Substantial evidence in the administrative record supports the conclusions of the ALJ, even if the ALJ's decision is read so as to support the conclusion that Ms. Owen's testimony as to her RFC was discredited.

## CONCLUSION

The court recommends that the decision of the agency denying benefits to Diane Owen be affirmed in all respects.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely

objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated March 27, 2009.

BY THE COURT:

*/s/ Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE